UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUAN CRUZ,

           Petitioner,                    Case Number 16-10097
                                                Honorable David M. Lawson

v.

SHERRY BURT,

           Respondent.
_____/

**<u>OPINION AND ORDER DENYING AMENDED PETITION
FOR WRIT OF HABEAS CORPUS</u>**

      Petitioner Juan Cruz was convicted in 2012 of the 1989 murder of his girlfriend. After failing to obtain relief from the Michigan appellate courts, Cruz filed a petition for a writ of habeas corpus. After returning to state court to exhaust additional claims, he filed an amended petition under 28 U.S.C. § 2254, which is now before the Court. Cruz alleges evidentiary errors, prosecutorial misconduct, and ineffective assistance of counsel. He also contends that his lengthy prison sentence was excessive because it exceeded a previous plea offer. Because the state courts' rejection of these claims was consistent with federal law as determined by the Supreme Court, the petition will be denied.

                                                I.

      Cruz was convicted of shooting Rosie Woolwine. Her body was found on June 18, 1989 just inside the entrance leading to the front upstairs unit of the duplex where Cruz lived in Detroit. An evidence technician responding to the scene saw the woman's body lying behind the front door near the staircase leading to the front upstairs apartment. She was wrapped in a blue sleeping bag

and blanket. In the front upstairs apartment was a large sofa with a pool of dried blood underneath one of the cushions. There also was spotted blood on the back cushion.

Autopsy evidence revealed external injuries on the shoulders, neck, face, and head, and a close-range entrance gunshot wound on the left side of the head with an exit wound was on the right side of the head. The medical examiner estimated that Woolwine died about 48 hours before his examination on June 19, 1989.

Cruz moved to Mexico soon after the shooting. Although Cruz was the lead suspect, the case went cold after he left the country. Cruz was eventually arrested in Mexico City in 2011, and he was extradited to the United States in 2012 to stand trial.

The trial evidence pointing to Cruz as the perpetrator was largely circumstantial, except for the testimony of Cruz's former girlfriend, Rosa Maria Torres, who testified that Cruz admitted to her that he shot Woolwine.

Woolwine's sister, Maria Hernandez, testified that Woolwine lived at her family home with her children, siblings, and mother. Maria last saw Rosie alive on Tuesday, June 13, 1989, a date she remembered because it coincided with the Detroit Pistons' last championship playoff game. Rosie left the family home during the afternoon to watch the game, but she never returned.

Two days later, on June 15, a man identifying himself as Juan phoned the family house. He told Maria that Rosie was okay, but when Maria asked to speak with her, the man responded that Rosie was not available. Maria's brother, James Woolwine, also concerned for Rosie's welfare, took the phone from Maria and argued with the caller, who turned out to be Cruz. Maria and James then drove to Cruz's duplex.

James Woolwine described the heated conversion he had on the phone with Cruz. After the call, he and Maria drove to the duplex on Junction Street to look for Rosie. James told a man

who answered the front door that he was looking for his sister, but the man shooed him away, saying he did not want to get involved. The house had two separate entrances in the front and one in the back. The upstairs unit was divided into two apartments. James then went around to the back of the house, where he found an open staircase the led to the rear apartment. He climbed it and went into the vacant second-story apartment in the back of the duplex. That was not Cruz's apartment. James found nothing and left.

Edmundo Rodriquez testified that he lived alone in the single lower unit at the Junction Street address in June of 1989. The house's front entrances led to Rodriquez's unit and to the front upstairs apartment, which was rented by a man named Victor. The back entrance led to a second vacant upstairs apartment. Rodriquez testified that Victor had people staying with him, but he did not know who they were. He did not know Juan Cruz. On Saturday, June 17, 1989, around 10 p.m., Rodriquez heard some noise coming from the stairwell. He investigated and saw Victor who said he was throwing away garbage. Later, around 1:30 a.m., he heard a noise that sounded like something was being dragged down the stairs, and a few hours later he saw and heard Victor and another man using a ladder to enter the apartment. Rodriquez did not hear any gunshots or arguing in the upstairs apartment.

Rafael Rivas testified that he was the man who was with Victor at the duplex when they used the ladder to gain entry because Victor said he did not have his key. He also said that Cruz was living in Victor's apartment during that time frame. Rivas testified that sometime before June 22, 1989, Cruz tried to sell him a pistol, but Rivas declined.

Rebecca Lugo, Rosie's mother, testified about her concern with Rosie's relationship with Cruz. Rosie had her own apartment, but she agreed to stay at the family house after her mother saw bullet holes in the walls and ceiling of the apartment and saw bruises on Rosie's arms and

legs. Rosie's daughter Theresa Ramirez, seven years old at the time of her mother's death, testified about an occasion as a child when she heard Cruz struggling with her mother at night, and her mom was telling him "no" and "stop." Lisa Reyna, Rosie's cousin who worked at the same bar as Rosie, testified that she knew Rosie and Cruz fought a lot, and she saw bruising on Rosie's arms and legs. Rosie was at the bar on the night of the basketball game. Reyna said Rosie was angry with Cruz that evening because one of his other girlfriends was at the bar.

Rosa Maria Torres testified that she had been in a relationship with Cruz for about nine years and they had two children together by 1987. She testified that during their relationship, Cruz would hit, kick, and choke her. Cruz also once pointed a gun at her when he was living on Junction Street. On the night of the Pistons' game, Cruz borrowed her car, and when she went to retrieve it from him at the Junction Street address that night, she saw Rosie's car in front. She wanted to confront Rosie and yelled for her to come outside, but Rosie never emerged. Torres waited for a few minutes and then left.

The next morning, Wednesday, June 14, 1987, Torres testified that Cruz called her and told her that he needed to take her car again, and that he wanted to get in touch with his brother Hector regarding a life-or-death matter. Cruz explained to Torres that he had pointed a gun at Rosie, that it went off, and that he shot her. Cruz said that he had wrapped Rosie's body up in a bag or blanket and put her in a closet. The next day, Torres went to the airport with Hector and Cruz because Cruz was going to Mexico. Torres went along because she wanted to make sure that he was not actually going with Rosie. Rosie was not with him.

The jury found Cruz guilty of second-degree murder and commission of a felony with a firearm. He was sentenced to serve forty to ninety years in prison for the murder and a consecutive two-year term on the firearm offense. His convictions and sentences were affirmed on direct

appeal. *People v. Cruz*, 2014 WL 2218993 (Mich. Ct. App. May 27, 2014), *lv. den.* 856 N.W.2d 50 (Mich. 2014) (table).

Cruz thereafter filed his initial petition for writ of habeas corpus in this Court on January 11, 2016, and a few weeks later, he filed a motion to hold the petition in abeyance so that he could exhaust additional claims in the state courts. The Court granted the motion.

Finding no success in the state court, Cruz returned here and filed an amended petition for a writ of habeas corpus which raises four claims:

> I. Petitioner was deprived of his right to due process and a fair trial where the trial court's admission of evidence was more prejudicial than probative, and served no purpose other than to inflame the passions of the jury.
>
> II. Petitioner was deprived of his right to due process and a fair trial when the prosecutor used flagrant and inflammatory language which was improper and argued facts unsupported by the evidence.
>
> III. Petitioner was deprived of his right to due process when he was given a determinate sentence far exceeding his life expectancy and which was contrary to his *Cobbs* evaluation.
>
> IV. Petitioner was denied the effective assistance of trial counsel in violation of the Sixth Amendment.

Amend. Pet. at 2-3, ECF No. 19, PageID.1482-83.

II.

Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court may grant relief only if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

States," or if the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

"Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotation marks and citations omitted). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review. Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (quotation marks omitted)). The AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

A.

Cruz first argues that his trial was rendered fundamentally unfair when the trial court allowed the prosecutor to offer gruesome autopsy photos of the victim. He asserts that the defense did not dispute that a gunshot wound was the cause of death, and that the photos only served to inflame the jury.

Cruz focuses his argument on three specific photos. The photos were not made part of the record in this Court; however, the first photograph was described as depicting the gunshot wound on the left side of the victim's head. It was taken at the morgue. The second photo showed the victim's body as it was found at the bottom of the staircase leading to the front upstairs unit at the duplex. The final photo was a close-up shot of the victim's face at the scene, and it showed the top portion of her body wrapped in a blanket.

The Michigan Court of Appeals rejected the claim on the merits, finding that the photos were properly admitted under state evidentiary rules. *Cruz*, 2014 WL 2218993, at *1-3. It held that the first photo showing the location of the gunshot wound was relevant to show Cruz's intent to kill and to his defense of accident. The photo also was described as depicting decomposing brain tissue spread into the victim's hair. The trial court excluded a similar but purportedly more gruesome photo of the entrance wound. The other two photos, showing the location and condition in which the victim's body was found, were relevant to show Cruz's intent, and they also provided partial corroboration to Rosa Torres's testimony that Cruz told her that he wrapped the victim's body in a bag or blanket.

State evidentiary rulings will not trigger federal due process concerns unless the evidence admitted (or excluded) renders the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The Supreme Court has stated that for evidence that is so unfairly prejudicial "that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). "Unfair prejudice" means that the evidence would be used by the jury for an improper purpose, such as declaring guilt on a ground different from proof specific to the offense charged. *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

The state courts did not address any question of unfairness of the photographs, fundamental or otherwise, but they did determine that the evidence has a proper purpose. And the rejection of the petitioner's objection, even in light of his offer to stipulate that the victim dies from a gunshot wound is consistent with "the accepted rule that the prosecution is entitled to prove its case free from any defendant's option to stipulate the evidence away." *Id.* at 189. A prosecutor must not only prove the elements of a crime but also must manage jurors' expectations. As for reliance solely on the medical examiner's testimony, one must remember that "[a] syllogism is not a story, and a naked proposition in a courtroom may be no match for the robust evidence that would be used to prove it." *Ibid.* And as to the proposed stipulation, "[a] convincing tale can be told with economy, but when economy becomes a break in the natural sequence of narrative evidence, an assurance that the missing link is really there is never more than second best." *Ibid.*

The admission at trial of gruesome photographs of a murder victim is not fundamentally unfair where, as here, there is some legitimate evidentiary purpose for the photographs' admission. *See Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005) (upholding the admission of photographs depicting a victim's severed head, severed breast, and severed body parts placed near the victim's torso because the photographs were highly probative of the prosecutor's claim that the petitioner beat the victim severely and meticulously dissected her body); *Frazier v. Huffman*, 343 F.3d 780, 789 (6th Cir. 2003) (finding acceptable the admission of multiple photographs of the victim used by the coroner to illustrate the nature of the encounter preceding the victim's death); *Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002) (observing that "although the photographs were gruesome, they were highly probative").

The photographs at issue here served a legitimate evidentiary purpose. The morgue shot was relevant to intent and accident, and the stairwell shots were relevant to corroborate Torres's

account of Cruz's statement to her after the shooting. Moreover, they do not seem to have been any more gruesome than the graphicly described photos in the above cited cases. The decision of the state court upholding admission of the photos therefore did not involve an unreasonable application of established Supreme Court law. *Franklin v. Bradshaw*, 695 F.3d 439, 456-57 (6th Cir. 2012). Cruz's first claim is therefore without merit.

B.

Cruz next contends that the prosecutor committed misconduct during opening statement and closing argument by appealing for sympathy for the victim and by making arguments that were not supported by the evidence. After reciting the standard governing claims of prosecutorial misconduct, the Michigan Court of Appeals found that the claim was without merit. *Cruz*, 2014 WL 2218993, at *6-8.

A prosecutor's misconduct will require habeas corpus relief when the conduct complained of "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) and calling *Darden* the "clearly established Federal law" on the issue). *Parker* notes that "the *Darden* standard is a very general one," which permits state courts "more leeway . . . in reaching outcomes in case-by-case determinations[.]" *Id*. at 48 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). On habeas review, the AEDPA raises the bar even higher than the "high standard" set by *Darden*. *Halvorsen v. White*, 746 F. App'x 489, 499 (6th Cir. 2018) (citing *Parker*, 567 U.S. at 48). To obtain habeas relief, "[t]he misconduct must so clearly violate *Darden* that the state court's failure to identify it was not just erroneous, but 'objectively unreasonable.'" *Id*. at 497 (citing *Williams*, 529 U.S. at 409). *Darden* itself did not find unconstitutional a prosecutor's characterization of the defendant as an "animal" or his expressed

wish that he "could see [the defendant] with no face, blown away by a shotgun." *Darden*, 477 U.S. at 180, nn.11, 12. Even where prosecutors' statements are so extreme as to be "universally condemned," the inquiry remains whether due process was denied. *Id*. at 181.

Cruz says that the prosecutor appealed to the jury's sympathies in her opening statement when, after describing the murder, she accused Cruz of "[taking] a mother away from her four-*year-old son, her seven-year-old daughter and her eight-year-old daughter*." Although this statement was made deliberately, it did not "manipulate or misstate the evidence," or otherwise mislead the jury. *See Darden*, 477 U.S. at 181; *see also Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir. 2004). Even assuming that the prosecutor's statement was improper, it was brief, and any potential for prejudice was mitigated by the trial court's jury instruction not to allow prejudice or sympathy to affect the decision. *Darden*, 477 U.S. at 182. The state appellate court's rejection of this claim reasonably applied federal law.

Cruz also asserts that the prosecutor argued facts not supported by the evidence during closing argument. One of the investigators on the case testified that he sometimes, although not frequently, had subpoenaed phone records as part of an investigation, but he did not do so in this case. In closing argument referring to this testimony, defense counsel argued that police easily could have discovered if Cruz called the victim's family by subpoenaing phone records to find out the origin of the call. The prosecutor responded in rebuttal:

> You think you can get information about who called you from a pay phone and where they called from and all that? The police weren't doing that kind of [investigative work] back then because it wouldn't be there. You're not going to get [tracing information] and incoming call[s], local call. You're going to get outgoing, long distance calls. That's what's on your phone bill.

ECF No. 24-12, PageID.2442-43.

No evidence was offered at trial by either side whether it was possible to obtain phone records in 1989 that could trace the source of calls from the receiving number. Defense counsel argued that tracing the call was "easy," but that was not a statement based on any evidence presented. The state court determined that the prosecutor's response to the unfounded argument was a fair response. *Cruz*, 2014 WL 2218993, at *8. That determination reasonably applied federal law. *See United States v. Robinson*, 244 F.3d 503, 508 (6th Cir. 2001).

Prosecutors have latitude to argue reasonable inferences from the evidence presented and to ask the jury to use its common sense. *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008); *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000); *United States v. Smith*, 89 F. App'x 494, 498 (6th Cir. 2004). The detective testified that back in 1989, he sometimes subpoenaed phone records, but he did not do so frequently. Several witnesses testified how cellphones were not in common use in 1989. A common-sense inference could be drawn from this testimony that the detective did not frequently subpoena phone records in such cases because doing so was not likely to provide useful information, or at least that it was not "easy" to obtain tracing data, as defense counsel argued. The prosecutor's response to defense counsel's argument was fair, and it asked the jury to use its common sense and make a reasonable inference based on the evidence presented.

The Michigan Court of Appeals reasonably denied relief with respect to this claim.

C.

Cruz's third claim is based on apparent pretrial plea negotiations that fell through. Under state law, the trial courts can involve themselves in plea negotiations by committing to a specified sentence before the guilty plea is tendered. *People v. Cobbs*, 443 Mich. 276, 283, 505 N.W.2d 208, 212 (1993). Cruz argues that the trial court erred by sentencing him in excess of the twenty-to-forty-year plea proposal that it made during pretrial proceedings when the parties discussed the

status of plea negotiations. As a related argument, he asserts that his forty-to-ninety-year sentence is cruel and unusual because it exceeds his likely life expectancy.

The claim that the sentence exceeding the court's pretrial evaluation is not cognizable by a federal court. The Michigan Court of Appeals found that Cruz was not entitled to a sentence within the trial court's pretrial evaluation because under state law that evaluation only applied had Cruz chosen to accept the plea offer. The evaluation had no relevance under state law to a sentence imposed after trial. *Cruz*, 2014 WL 2118993, at *9-10.

Under state law, a defendant in Michigan may enter a guilty plea in reliance on the trial court's preliminary evaluation as to what his sentence will be, and if that evaluation is exceeded, he is then permitted to withdraw the plea. *Cobbs*, 443 Mich. at 283, 505 N.W.2d at 212. *Cobbs* does not restrict a trial court's sentencing discretion if the plea offer is rejected and the defendant is convicted after trial. *Cruz*, 2014 WL 2218993, at *10. The decision by the state court that Cruz was not entitled to sentencing relief under *Cobbs* is based on its determination that the state procedure promulgated in that case did not apply to his situation. That state-law holding is binding here. *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002) ("State law means what the state courts say it means. A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254.").

Cruz also asserts that his sentence is disproportionate because even the minimum forty-year term exceeds his life expectancy, and his sentence is effectively a mandatory life term. But Cruz has not identified any Supreme Court precedent that supports his argument. The Eighth Amendment forbids only extreme sentences that are grossly disproportionate to the crime. *See Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). "A sentence within the maximum set by statute

generally does not constitute cruel and unusual punishment." *Austin v. Jackson*, 213 F.3d 298, 302 (6th Cir. 2000) (cleaned up).

Cruz was 57 years old when he was sentenced. A 40-year minimum term means that it is likely he will die in prison. Nevertheless, the fact that a term of years may exceed a defendant's life expectancy does not render a sentence cruel or unusual. *See United States v. Beverly*, 369 F.3d 516, 537 (6th Cir. 2004) (citing *Harmelin*, 501 U.S. at 996) ("[T]he Supreme Court has never held that a sentence to a specific term of years, even if it might turn out to be more than the reasonable life expectancy of the defendant, constitutes cruel and unusual punishment."). Cruz was convicted of murdering a young woman, and he was at large — and at liberty — for over 20 years until he was arrested to answer for his crime. His lengthy sentence was warranted and is not grossly disproportionate to the seriousness of his crime.

Cruz's sentencing claims are without merit.

D.

Last, Cruz argues that his trial counsel was ineffective by failing to call Maria Rodriquez, a witness he says might have refuted testimony indicating that Torres yelled to the victim from the street before her death.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient, and that deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). An attorney's performance meets the first element when "counsel's representation [falls] below an objective standard of reasonableness." *Id*. at 688. The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Id*. at 687. "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688) (quotation marks omitted).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Unless a defendant demonstrates both deficient performance and prejudice, "it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the result unreliable." *Id*. at 687.

Success on ineffective assistance of counsel claims is relatively rare, because the *Strickland* standard is "'difficult to meet.'" *White*, 572 U.S. at 419 (quoting *Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013)). And under AEDPA, obtaining relief under *Strickland* is even more difficult because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). This doubly-deferential standard requires the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. 12, 15 (2013). "[T]he question is not whether counsel's actions were reasonable," but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Cruz did not provide the state courts with any affidavit from this proposed defense witness or offer other evidence of what she might have said. Nor has he furnished this Court with an affidavit from the uncalled witness describing her proposed testimony or expressing her willingness to have testified on his behalf at trial. Conclusory allegations of ineffective assistance of counsel without any evidentiary support do not provide a basis for habeas relief. *Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998). In the absence of such proof, Cruz is unable to establish that his counsel performed deficiently or that he was prejudiced by the failure to call this defense witness to testify at trial. *See Clark v. Waller*, 490 F.3d 551, 557 (6th Cir. 2007).

In any event, there is good reason to believe that counsel's choice not to call Maria Rodriquez was strategic. As such, Cruz "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. 668, 689 (1984) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). On this record, it appears that it was.

Cruz suggests that Rodriquez was present with Rosa Torres when Torres arrived at his residence and yelled for the victim, perhaps in an attempt to goad her into a confrontation. He notes that a neighbor testified that he heard no such loud screaming the night of the murder. But it was defense counsel who elicited the testimony from Torres that she was screaming outside Cruz's apartment, and then it was he who sought to impeach that testimony by way of the neighbor. The tactic, apparently, was to suggest that the alleged argument did not occur and was not the precipitating event that eventually led to the shooting. Counsel reasonably could have concluded that it was better to establish doubt in the minds of the jury through this testimony rather than call

a witness who (for all the record shows) may have scuttled the argument by corroborating Torres's account.

Cruz's ineffective assistance of counsel claim is therefore without merit.

III.

None of the petitioner's claims presents a basis to issue a writ of habeas corpus under 28 U.S.C. § 2254(d). The state courts' decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: June 10, 2021